## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| PREMIER PARTNERSHIPS, INC., a California Corporation, | ) ) ) | Case No.: 1:20-cv-484 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **COMPLAINT** |
| FUTBOL CLUB CINCINNATI LLC, an Ohio limited liability company, and FUSSBALL CLUB CINCINNATI LLC, an Ohio limited liability company, | ) ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants. | ) | |

Plaintiff Premier Partnerships, Inc. ("Plaintiff" or "Premier") brings this action for monetary damages, injunctive relief, and any other relief that this Court may award, for breach of a written contract governed by California law and breach of the California implied covenant of good faith and fair dealing against Defendants Futbol Club Cincinnati LLC and Fussball Club Cincinnati LLC (individually or collectively referred to as "FCC").  Premier alleges facts regarding itself based on personal knowledge, and makes all other allegations below based on information and belief after an investigation by Plaintiff and its undersigned California counsel.

## NATURE OF THE ACTION

1. As demonstrated herein, FCC has acted in bad faith and in violation of the terms of a contract it signed, and as a result, Premier has been prevented from realizing the benefit of its bargain with FCC by being stymied in its efforts to secure significant additional sponsorship revenues for FCC and the corresponding commissions that Premier would receive.  FCC's bad faith actions, breaches, and misconduct have caused over $40 million in damage to Premier.

2. Prior to being chosen by Major League Soccer ("MLS") as an official expansion team, FCC was a competitive club in the United Soccer League ("USL"), with one of the top fan bases in all of American professional soccer.  Looking to capitalize on its success in the form of increased sponsorship revenue and not having the know-how or ability to do so on its own, FCC turned to Premier.  Premier is an industry leading sponsorship sales and consulting firm, with a 17-year track record of maximizing revenue for facilities, events, sports and entertainment properties, and municipal programs across the country.

3. Over the course of three years, Premier leveraged its first-class reputation in the sponsorships business and its unparalleled rolodex on FCC's behalf, putting in thousands of hours of work to obtain over $86 million dollars in sponsorships for FCC.  Yet, despite the extraordinary results achieved by Premier, FCC was ungrateful.  FCC first extorted a better deal

for itself at Premier's expense by falsely claiming that Premier had breached their contract. After acting in bad faith to extract more favorable terms for itself, FCC then embarked on a blatant campaign to severely limit Premier's ability to effectively canvass the market and engage potential sponsors, thus shutting down Premier's opportunity to earn commissions despite the substantial amount of effort Premier had put forth in fulfilling its obligations under the contract. FCC's bad acts culminated in its decision to unilaterally terminate the contract without cause or justification, though the contract does not so allow.

4. FCC's actions have left Premier with no choice but to bring this lawsuit in order to enforce its rights under its contract with FCC.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), on the basis of complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of costs, interest, and attorney's fees.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b), as the defendant resides in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

7. Premier is a California Corporation with its principal place of business in Santa Monica, California. Premier is an industry leading sponsorship sales and consulting firm, with a 17-year track record of maximizing revenue for facilities, events, sports and entertainment properties, and municipal programs across the country.

8. Futbol Club Cincinnati LLC and Fussball Club Cincinnati LLC are both Ohio limited liability companies with their principal places of business in Cincinnati, Ohio. FCC is one of the 26 member clubs of Major League Soccer, the leading professional soccer league in

the United States. FCC has a strong fan base and will soon play in a 26,000-seat venue in the West End neighborhood in Cincinnati, which is scheduled to open in 2021. FCC's principal owner is Carl Lindner III. Prominent minority owners of FCC include Ken Oaks and Meg Whitman.

## FACTUAL ALLEGATIONS

9. FCC began play in 2016 as a United Soccer League club. By the second quarter of 2017, FCC had established itself as one of the league's most competitive clubs with one of the top fan bases in all of American professional soccer. By May 2017, this success had led to FCC being considered a top contender to be chosen as an MLS official expansion team. Looking to capitalize on its success in the form of sponsorship revenue, but lacking knowledge of the sports and entertainment marketing and sponsorships business, FCC sought professional consulting services and sales representation. Enter Premier.

10. Premier was co-founded in 2003 by Alan Rothenberg and Randy Bernstein. Mr. Rothenberg is a legend in the U.S. soccer community who spearheaded soccer's rise in the United States during the 1990s as chairman and CEO of the 1994 World Cup, chairman of the 1999 FIFA Women's World Cup, president and later chairman of the U.S. Soccer Federation, and a founder of MLS. Mr. Bernstein was also a founding executive of MLS, and he and his sales teams have secured billions of dollars in naming rights, sponsorship, advertising and corporate partnership support during his 35+ year career in sports and entertainment. Since its founding, Premier has filled a critical need for executive-level sales representation for sports and entertainment properties.

11. Prior to its promotion from USL to MLS, FCC decided to retain the services of Premier in an effort to showcase the commercial viability of FCC and the Cincinnati market to MLS leadership. Accordingly, on May 1, 2017, Premier, on the one hand, and FCC, on the other

1548485.2 4

hand, entered into an Agreement for Consulting Services (as amended, the "Agreement"). Under the Agreement, Premier would provide sales representation services, develop a business-to-business sponsorship platform, educate FCC's executives and staff about the sponsorship business, and work directly with FCC personnel in efforts to secure agreements with sponsors. The Agreement provided that Premier would be FCC's exclusive third party sponsorship consultant during the term of the Agreement. The Agreement further stated that it would terminate on the date of opening of FCC's new stadium, which the parties expected to occur in 2021, or upon a party's exercise of its right to terminate the Agreement due to a breach of the Agreement by the other party.

12. As compensation for its services, the Agreement provided that Premier would receive (i) a monthly retainer and (ii) commissions on total gross cash revenues secured by Premier for arrangements entered into by FCC for entitlements and sponsorships, which are referred to under the agreement as "Commercial Exploitation Rights" or "CER."

13. The Agreement provided that commissions due on CER revenues for any sponsorship agreement would last several years: (i) for MLS Agreements, commissions due on CER revenues were for the original contract term and the first extension or renewal thereof; and (ii) for USL Agreements, commissions due on CER revenues for any sponsorship agreement were for the original contract term and the first two extensions or renewals thereof. In fact, under Section 3.2.5, of the Agreement "FCC acknowledge[d] that its obligation to pay commissions to [Premier] pursuant to [the Agreement] may extend beyond the term of th[e] Agreement."

14. Section 3.2.5 of the Agreement also provides that Premier is entitled to commissions for "any CER Revenues actually received by FCC for any agreement pertaining to

the CER and secured, and which commences during the Term of this Agreement or within nine (9) months after termination of this Agreement, provided such agreements are with companies targeted during the Term of this Agreement and which appear on [Premier's] 'Pipeline Report' that is issued prior to the termination date of this Agreement."

15. For little more than a year, the parties followed through on their obligations under the contract. Premier secured tens of millions of dollars in CER revenue for FCC, and FCC typically made timely retainer and commission payments to Premier. And, although not required under the Agreement, Premier also used its long-standing relationships with MLS leadership to lobby for FCC's admission to MLS.

16. However, in or around October 2018, about five months after MLS selected it as an expansion team, FCC engaged in dubious behavior in order to secure a better deal for itself than the one it struck with Premier in May 2017. Despite lining its pockets with CER Revenue secured by Premier, and without making any good faith attempts to rectify any purported concerns with Premier's performance, FCC falsely claimed that Premier had breached the Agreement. FCC's bogus claim was a transparent, bad faith attempt to secure a better deal for itself and to deprive Premier of its benefit of the bargain under the Agreement.

17. Although Premier vigorously denied the false claims, in an effort to be a good partner and to continue its relationship with FCC, it agreed to amend the Agreement. On February 13, 2019, Premier, on the one hand, and FCC, on the other hand, executed the First Amendment to Consulting Agreement ("First Amendment"). Believing at the time that FCC was acting in good faith, Premier relinquished several rights and benefits it had under the contract. For example, it gave up its right to pursue certain levels of sponsorships and transferred back to FCC Premier's right to pursue hundreds of companies appearing on the Premier Pipeline Report,

representing millions of dollars of potential CER revenue, that FCC had previously agreed would be commissionable should Premier secure a contractual agreement for sponsorship.  Premier transferred its rights to pursue these companies back to FCC under the belief that FCC would act in good faith and honor its contractual promise not to unreasonably withhold future approvals, a contractual promise which is described in more detail below.  Although these companies were lower dollar sponsorship categories, in the aggregate they were worth many millions of dollars.

18. The First Amendment also amended Section 3.2.2.1, which governs Premier's entitlement to receive commission payments from FCC for MLS Agreements.  Under the original Agreement, FCC agreed to pay commissions "for all sponsor agreements entered into between FCC and Sponsors, whether such Sponsors are secured by [Premier], FCC, or any third parties."  Under the First Amendment, Section 3.2.2.1 was amended to require FCC to pay commissions only for sponsor agreements "that are secured as a result of the sales efforts of [Premier]."  Under that amended section, a Sponsor could only be considered "secured" as a result of the efforts of Premier "if (i) such Sponsor is identified on Schedule I attached hereto as being an actual or potential sponsor that [Premier] has either (a) secured a term sheet for a sponsorship as of the date of this First Amendment; or (b) been in active discussions prior to the date of this First Amendment with respect to a sponsorship for naming rights, kit, cornerstone or as an official partner (collectively, the "Pipeline Accounts"); or (ii) such Sponsor is identified by [Premier] following the date of this First Amendment and approved in writing by FCC as a potential sponsor for naming rights or cornerstone sponsorship."  The First Amendment further provided that as future potential sponsors were identified and approved, they were to be added to Schedule I.  Because it was important to Premier to have the ability to add companies to Schedule I, so that it could do its job and bring in sponsorship revenue, Premier and FCC agreed

that FCC's "approval of any potential sponsor for a naming rights or cornerstone sponsorship shall not be unreasonably withheld."

19. Section 3.2.5 was also amended. Although it still included that provision that "FCC acknowledges that its obligation to pay commissions to [Premier] pursuant to [this Agreement] may be extended beyond the term of th[e] Agreement", the tail period was reduced from nine to six months. Specifically, this revised provision entitled Premier to commissions for "any CER Revenues actually received by FCC for any agreement pertaining to the CER and secured, and which commences during the Term of this Agreement or within six (6) months after termination of this Agreement, provided such agreements are with companies identified on Schedule I attached hereto, as such schedule may be updated during the Term of this Agreement."

20. Premier also agreed to exceed certain CER revenue thresholds for the following two years. Section 8 of the First Amendment provided that:

> Premier has represented to FCC that total revenues secured by [Premier] for arrangements entered into by FCC for CER as a direct result of the sales efforts of Premier during (i) the 2019 MLS season will equal or exceed $8.1 million; and (ii) the 2020 MLS season will equal or exceed $10.875 million. In the event Premier *fails to deliver a term sheet or other written approval from Sponsors* that they desire to move forward towards definitive agreements that equal or exceed the foregoing sales commitments by May 1 of each of 2019 and 2020 for that particular season FCC may terminate this Consulting Agreement in its sole discretion upon providing written notice to Premier.

(emphasis added).

21. In advance of the 2019 MLS season, Premier fulfilled its contractual obligations by delivering term sheets and other written approvals from sponsors that were in excess of $8.1 million by the May 1, 2019 deadline.

22. Despite the fantastic 2019 results delivered by Premier, FCC again began undermining the contract. After having in excess of 700 companies approved to pursue under the original Agreement, by early 2019, Premier's approved list of companies had been reduced to only 99 companies, which were listed in Schedule I of the Amended Agreement. Over the course of the subsequent 12-month period, Premier submitted approximately 160 additional companies for approval, of which FCC approved a mere 23 companies in March 2019, about a 14% approval rate. By May 1, 2020, it had been over a year since FCC had approved any additional companies, despite the fact that Premier had repeatedly and consistently requested prospective target companies be added to the target list. Not only did FCC not approve any of the companies, it did not even provide a meaningful response to Premier's approval requests, frequently ignoring repeated inquiries.

23. Through it all, Premier continued to perform its obligations under the contract by selling sponsorships and presenting prospective deals to FCC. However, FCC stymied and undermined most of these efforts, often failing to inform Premier of important FCC and stadium related information and developments relevant to Premier's sales efforts. Premier often became aware of such information and developments only through third-party social media or industry news outlets.

24. For example, in or around March 2020, Premier secured a competitive offer from "Company A" (a pseudonym) to provide the new stadium's LED signage, which was also coupled with an attractive sponsorship worth $425,000 to FCC. Inexplicably, FCC rejected the Company A offer in favor of a less lucrative bid by another vendor that included a sponsorship offer worth only a fraction of Company A's. Despite Company A having successfully provided LED equipment to many of the most complex stadium and arena projects in the world, FCC

provided the incredible and unreasonable pretext that FCC "had concerns about [Company A]'s ability to effectively service their stadium project" as its grounds for rejecting the offer.

25. FCC also thwarted a very favorable (and lucrative) naming rights sponsorship for the new stadium.  In 2018, Premier began conversations with "Company B," a large Cincinnati-based firm that FCC had approved as a commissionable potential sponsor.  Company B is identified as an approved target on Schedule 1 of the Amended Agreement.  Over the course of several months, Premier negotiated a potential sponsorship with Company B, which also included in-person presentations.  Premier's efforts to develop a strong mutual trust and professional rapport with Company B representatives led to an initial draft of a formal sponsorship agreement for stadium naming rights.  As negotiations continued to progress in a positive direction as a result of Premier's substantial efforts, FCC representatives inserted themselves more prominently into the negotiations in finalizing a formal contract, often excluding Premier from relevant meetings and calls.  Despite these actions, Premier continued to represent FCC's best interests to Company B, working in good faith to help finalize a deal.  FCC and Company B representatives ultimately agreed to the financial terms of a stadium naming rights agreement, and each party's respective legal counsel were working through the final edits of the formal agreement.  Under the negotiated terms, Company B was prepared to pay an amount that would have been the third largest MLS naming rights deal ever—no small feat for a team in what was then the smallest market in MLS and only the 35th largest market in the United States, and that had only recently been promoted to MLS.  Company B was also going to be locked in for the long term, as it was prepared to commit to being the naming rights partner for a minimum of 17 years, with options to extend their agreement to a total of 27 years.  However, in late 2019, having already mutually agreed to financial terms with FCC and while Company B

was in the process of reviewing and redlining a draft of the formal naming rights agreement, FCC, with no advance notice, communicated a need to stop all naming rights contract negotiations with Company B.  Of course Premier complied with the request.  But it was still hopeful that there could be a path forward.  It was later communicated to Premier that FCC was reluctant to move forward with the financial terms of the agreement, which is puzzling since these were the terms that FCC representatives themselves had already agreed to during negotiations.

26.     In an attempt to salvage the extremely lucrative deal with Company B, Premier Chairman Alan Rothenberg reached out directly to FCC owner Meg Whitman.  Mr. Rothenberg sent a letter to Ms. Whitman explaining the tremendous upside of the Company B deal and the substantial risks that FCC would incur by not engaging a naming rights partner.  Mr. Rothenberg's letter was followed by an in-person meeting with FCC's senior management, including Ms. Whitman.  Unfortunately, Ms. Whitman and FCC inexplicably rejected Premier's advice and allowed the Company B deal to die.

27.     Despite FCC's bad faith actions that led to the demise of these, and other, lucrative deals, <u>Premier fulfilled its contractual duties under the First Amendment by delivering term sheets and other written approvals from sponsors to FCC in excess of $10,875,000 in CER revenue for the 2020 MLS season.</u>  This was a significant increase over 2019 sponsorship revenue and an exceptional result considering it was achieved prior to the opening of the new stadium and after an abysmal 2019 on field team performance.

28.     Premier's achievement is no surprise.  In addition to leveraging its first-class reputation in the sponsorships business and its unparalleled rolodex, Premier also rolled up its sleeves and put in thousands of hours of hard work to obtain these outstanding results.

1548485.2                                                   11

29. Yet, on May 1, 2020, FCC decided to again breach the Agreement by sending a letter to Premier stating that it was terminating the Agreement and instructing Premier to cease acting on FCC's behalf. The purported basis for FCC's termination of the Agreement was Premier's alleged failure to exceed its 2020 revenue target, which, as discussed above, is false. The letter was also sent in derogation of Section 6.3 of the Agreement, which states that a party to the Agreement must provide 30 days' notice before terminating the Agreement on the grounds of a purported breach.

30. FCC's purported termination of the Agreement is emblematic of the underhanded way it has behaved throughout its relationship with Premier. Premier fulfilled its obligations by securing lucrative sponsorships for FCC; FCC failed to fulfill its obligations by acting in bad faith towards Premier in an attempt to deprive Premier of the benefit of its bargain from the Agreement, as displayed by: (a) FCC's inexplicable conduct towards Company B, which led to the rejection of the Company B deal (which is perhaps merely just a suspension, as FCC attempts to run out the clock on Premier's fee tail); (b) FCC's attempts to cut Premier out of sponsorship deals that it had negotiated; (c) FCC's failure to add third parties to the Premier Pipeline Report despite repeated requests, and in derogation of its obligations under the contract; and (d) other bad faith acts to be shown after discovery.

31. Literally up to the very day that FCC sent its letter, Premier continued its vigorous efforts to secure sponsorships for FCC. In the morning on May 1, 2020, Premier notified FCC that a redlined version of a final agreement from "Company C," which reflected $1,000,000 in sponsorship revenue for FCC, was forthcoming in two to three weeks.

32. Given the foregoing, and FCC's persistent bad faith efforts to evade compensating Premier for its hard work as FCC is contractually obligated to do, Premier has been forced to initiate this proceeding.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

33. The allegations in paragraphs 1 through 32 of this Complaint are incorporated by reference herein with the same force and effect as though set forth in full below.

34. The Agreement is a valid and binding written contract between Premier and FCC.

35. Premier performed all or substantially all of its obligations under the contract, except for those terms and conditions that have been excused, prevented, waived and/or released.

36. FCC breached or otherwise repudiated its obligations under the contract by, among other things, (i) unilaterally terminating the contract in violation of its terms; (ii) directing Premier to cease acting on FCC's behalf; (iii) cutting Premier out of naming rights deals and other deals; (iv) unreasonably failing to consent to approximately 100 prospective companies to be added to Schedule I; and (v) making a bad faith allegation that Premier breached the contract in 2018 in order to strike a better deal for itself at the expense of Premier's benefit of the bargain under the contract.

37. As a direct and proximate result of FCC's breach of the contract, Premier has suffered, and continues to suffer, actual, consequential, general and special compensatory damages in an amount to be determined at trial.

## **SECOND CAUSE OF ACTION**

### **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

38. The allegations of Paragraphs 1 through 32 and 33 through 37 of this Complaint are incorporated by reference herein with the same force and effect as though set forth in full below.

39. The Agreement is a valid and binding written contract between Premier and FCC.

40. The Agreement provides that it is governed by California law.

41. Under California law, there is an implied covenant of good faith and fair dealing inherent in every contract such that no party may act to deprive the other of the benefits and bargains of the agreement.

42. Premier performed all or substantially all of its obligations under the contract, except for those terms and conditions that have been excused, prevented, waived, and/or released.

43. FCC breached the covenant of good faith and fair dealing by, among other things, (i) unilaterally terminating the contract in violation of its terms; (ii) directing Premier to cease acting on FCC's behalf; (iii) failing to work in good faith on the naming rights deal and other deals; (iv) unreasonably failing to consent to approximately 100 prospective companies to be added to Schedule I; and (v) making a bad faith allegation that Premier breached the contract in 2018 in order to strike a better deal for itself at the expense of Premier's benefit of the bargain under the contract.

44. As a direct and proximate result of FCC's breach of the implied covenant of good faith and fair dealing, Premier has suffered, and continues to suffer, actual, consequential, general and special compensatory damages in an amount to be determined by the trier of fact.

**PRAYER FOR RELIEF**

1. For an award to Premier for actual, consequential, general and special compensatory and punitive damages in an amount to be determined by the trier of fact;

2. Pursuant to Section 5 of the Agreement an award of reasonable attorneys' fees and costs of suit;

3. For pre- and post-judgment interest as permitted by applicable law;

4. For declaratory judgement determining that FCC has materially breached and repudiated the Agreement and that Premier retains all benefits appertaining thereto; and

5. For any such other and further relief at law or in equity as the trier of fact determines to be just and proper.

DATED: June 22, 2020

                                        */s/ Steven J. Miller*
STEVEN J. MILLER (0014293)
DAVID A. KUNSELMAN (0073980)
MILLER GOLER FAEGES LAPINE LLP
1301 East 9th Street, Suite 2700
Cleveland, OH  44114-1835
Tel: (216) 696-3366 ◆ Fax: (216) 363-5835
Miller@MGFL-law.com
Kunselman@MGFL-law.com

ERIC M. GEORGE (*pro hac vice* pending)
JAMES L. MICHAELS (*pro hac vice* pending)
BROWNE GEORGE ROSS LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
Email:  egeorge@bgrfirm.com
Email:  jmichaels@bgrfirm.com

*Attorneys for Plaintiff*
*Premier Partnerships, Inc.*